**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALASKA COMMUNITY ACTION ON TOXICS et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 12-1299 (JDB)** |
| **U.S. ENVIRONMENTAL PROTECTION AGENCY et al.,** | |
| **Defendants,** | |
| **and** | |
| **AMERICAN PETROLEUM INSTITUTE,** | |
| **Intervenor-Defendant.** | |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs Alaska Community Action on Toxics, Cook Inletkeeper, Florida Wildlife Federation, Gulf Restoration Network, Louisiana Environmental Action Network, Louisiana Shrimp Association, Sierra Club, and Waterkeeper Alliance bring this action against defendants the U.S. Environmental Protection Agency and its Administrator, Lisa Jackson (collectively, "EPA"), under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(2), and the Administrative Procedure Act, 5 U.S.C. §§ 551 <u>et seq.</u>  Plaintiffs assert sixty-five causes of action in their complaint, all of which are based on the fact that EPA's list of dispersants and other products that may be used in the event of an oil discharge – called the NCP Product Schedule – does not specify the waters or quantities in which listed products may be used.  EPA and intervenor-defendant American Petroleum Institute ("API") have moved to dismiss plaintiffs'

claims under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  For the following reasons, the motions to dismiss will be granted.

## BACKGROUND

Congress passed the Clean Water Act ("CWA" or the "Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Section 311 of the Act, as amended by the Oil Pollution Act of 1990, is directed at preparing for and responding to oil spills.  See id. § 1321.  Pursuant to section 311(d), EPA is required to "prepare and publish a National Contingency Plan for removal of oil and hazardous substances."  See id. § 1321(d)(1).[1]  The National Contingency Plan ("NCP") must "provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances," and must include a number of items set forth by statute.  Id. § 1321(d)(2).  Relevant here, the NCP must include:

A schedule, prepared in cooperation with the States, identifying –

(i) dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the Plan,[2]
(ii) the waters in which such dispersants, other chemicals, and other spill mitigating devices and substances may be used, and
(iii) the quantities of such dispersant, other chemicals, or other spill mitigating device or substance which can be used safely in such waters,

which schedule shall provide in the case of any dispersant, chemical, spill

---

[1] Section 311(d) directs the President to prepare and publish the National Contingency Plan; the President has delegated this authority to EPA.  See 33 U.S.C. § 1321(d)(1); Exec. Order No. 12,777, 56 Fed. Reg. 54,757 (Oct. 18, 1991); Exec. Order No. 11,735, 38 Fed. Reg. 21,243 (Aug. 3, 1973).

[2] "[D]ispersants, other chemicals, and other spill mitigating devices and substances" will collectively be referred to as "dispersants" or "listed products" in this opinion.

> mitigating device or substance, or waters not specifically identified in such schedule that the President, or his delegate, may, on a case-by-case basis, identify the dispersants, other chemicals, and other spill mitigating devices and substances which may be used, the waters in which they may be used, and the quantities which can be used safely in such waters.

Id. § 1321(d)(2)(G).  EPA has promulgated both the NCP, see 40 C.F.R. §§ 300.1 et seq., and the schedule of dispersants required by section 311(d)(2)(G), known as the NCP Product Schedule, see 40 C.F.R. §§ 300.900 et seq.

EPA first implemented the Act's requirement to prepare a product schedule (formerly section 311(c)(2)(G) of the Act) in Annex X to the NCP.  See 38 Fed. Reg. 21,887, 21,906 (Aug. 13, 1973).  Annex X provided that chemical agents could not be used to treat an oil discharge unless they were listed on EPA's Product Schedule.  The original schedule included 30 dispersants and other products, but did not identify the waters or quantities in which they could be used.  Annex X also set forth procedures by which On-Scene Coordinators ("OSC") could authorize the use of listed products in responding to oil spills.[3]  In 1982, EPA substantially revised the NCP and at that time established Subpart H in place of Annex X.  See 47 Fed. Reg. 31,180, 31,201 (July 16, 1982).  Subpart H permitted OSCs to authorize the use of products previously listed on the schedule prepared pursuant to Annex X, but did not include testing procedures or a process for adding dispersants to that schedule.  Id.  EPA proposed revisions to Subpart H in December 1983, and in July 1984 published a final rule amending Subpart H to specify testing and data requirements for adding dispersants to the product schedule.  49 Fed. Reg. 29,192, 29,192 (July 18, 1984).  In the final rule, EPA explained the NCP Product Schedule as follows:

---

[3] An OSC is a federal official predesignated by EPA or the U.S. Coast Guard to coordinate and direct the response to an oil discharge.  See 40 C.F.R. § 300.5.

> Under today's rule, Subpart H is similar to Annex X in that it does not identify the waters or quantities in which listed dispersants and chemicals may safely be used. The wide variability in waters, weather conditions, organisms living in the waters, and types of oil that might be discharged requires a flexible approach. Thus, the waters and quantities in which a dispersant or chemical agent may safely be used are to be determined in each case by the OSC on the basis of all relevant circumstances. The data requirements for placement of a product on the NCP Product Schedule are designed to provide sufficient data for OSCs to judge whether and in what quantities a dispersant may safely be used to control a particular discharge. The standardized testing procedures set out in the rule are intended to ensure that OSCs have comparable data regarding the effectiveness and toxicity of different products.

Id. at 29,193; see also 48 Fed. Reg. 56,484, 56,484 (Dec. 21, 1983) (proposed rule giving similar explanation as to why "EPA's NCP Product Schedule does not identify the waters in which listed dispersants and chemicals may be used or the quantities of those dispersants or chemicals that can safely be used in such waters").

EPA further revised the NCP in 1990 and again in 1994, after the Oil Pollution Act of 1990 amended the oil spill provisions of the CWA. Although EPA made many changes to the NCP in light of the 1990 legislation, its decision "not [to] identify the waters or quantities in which listed dispersants and chemicals may safely be used" did not change. See 49 Fed. Reg. at 29,193. The NCP has not been revised since 1994.

Today, former Subpart H is now Subpart J, "Use of Dispersants and Other Chemicals," 40 C.F.R. §§ 300.900-.920. See 55 Fed. Reg. 8666, 8808 (Mar. 8, 1990). Subpart J regulations implement section 311(d)(2)(G) of the CWA and set forth the procedure for adding dispersants to the NCP Product Schedule. See id. §§ 300.900(a), 300.920. For a product to be added to the schedule, the manufacturer of the product must submit technical product data specified in 40 C.F.R. § 300.915 to EPA. Id. § 300.920. For dispersants, the required data includes the results of effectiveness and toxicity testing. See id. § 300.915(a).

4

The listing of a product on the NCP Product Schedule "does not mean that EPA approves, authorizes, or encourages the use of that product on an oil spill; rather, the listing of a product means only that data have been submitted to EPA as required by Subpart J of the NCP." 59 Fed. Reg. 47,384, 47,407 (Sept. 15, 1994); see also 40 C.F.R. § 300.920(e).  Accordingly, the NCP Product Schedule, which is maintained by EPA and published on its website, includes the following disclaimer:

> [PRODUCT NAME] is on the U.S. Environmental Protection Agency's NCP Product Schedule.  This listing does NOT mean that EPA approves, recommends, licenses, certifies, or authorizes the use of [PRODUCT NAME] on an oil discharge.  This listing means only that data have been submitted to EPA as required by subpart J of the National Contingency Plan, § 300.915.

See 40 C.F.R. § 300.920; Pls.' Opp'n to EPA's Mot. to Dismiss [ECF 21] ("Pls.' Opp'n to EPA MTD"), Ex. A.

The listing of a product on the NCP Product Schedule does mean that the product is potentially eligible for use on an oil discharge.  40 C.F.R. § 300.905(a)(1).  The Subpart J regulations direct Regional Response Teams and Area Committees, which are organizational bodies that have responsibility for preparing and planning for oil discharges, to address the desirability of using products listed on the NCP Product Schedule and to develop "preauthorization plans" where appropriate.  See id. § 300.910(a).  Preauthorization plans should address "the specific contexts in which [listed] products should and should not be used" and factors such as "the potential sources and types of oil that might be spilled, the existence and location of environmentally sensitive resources that might be impacted by spilled oil, available product and storage locations, available equipment and adequately trained operators, and the available means to monitor product application and effectiveness."  See id.  Preauthorization plans are reviewed by representatives from EPA, the Department of Commerce, and the

5

Department of the Interior, and by states having jurisdiction over the waters to which a plan applies; if a plan is approved, then preauthorized products may be used as specified when an oil spill occurs.  Id.  In an oil spill situation not covered by a preauthorization plan, the OSC may authorize the use of products listed on the NCP Product Schedule if the OSC obtains the concurrence of an EPA representative and, as appropriate, representatives from the affected states.  Id. § 300.910(b).  The OSC may authorize the use of any dispersant, regardless of whether it is listed on the NCP Product Schedule and without obtaining any concurrences, if, "in the judgment of the OSC, the use of the product is necessary to prevent or substantially reduce a hazard to human life."  Id. § 300.910(d).

During the 2010 Deepwater Horizon oil disaster, decisionmakers responding to the spill released about 1.84 million gallons of two listed dispersants, Corexit EC9500A and Corexit EC9527A, into the Gulf of Mexico.  Compl. ¶ 109.  According to plaintiffs, the release of mass quantities of these two dispersants was authorized despite a "lack of information about the quantities of dispersants that could be used safely in the Gulf of Mexico" – a problem allegedly due to EPA's failure to identify, on the NCP Product Schedule, the waters in which listed dispersants could be used and the quantities in which listed dispersants could be used safely in such waters.  Id. ¶ 112, 117-18.

Plaintiffs filed this action against EPA based on EPA's failure to identify such waters and quantities on the NCP Product Schedule.  Plaintiffs assert sixty-five causes of action in their complaint: the First and Second Causes of Action allege that EPA has failed to perform a nondiscretionary duty under the CWA; the Third and Fourth Causes of Action allege that EPA has unreasonably delayed taking action required by the CWA in violation of the APA; the Fifth and Sixth Causes of Action allege that EPA's failure to specify waters and quantities on the NCP

6

Product Schedule is arbitrary and capricious in violation of the APA; and the Seventh through

Sixty-Fifth Causes of Action allege that each time EPA listed or relisted a product on the NCP

Product Schedule in the six years preceding this lawsuit it acted arbitrarily and capriciously.  See

Compl. 35-40.  EPA and API have moved to dismiss all of plaintiffs' claims.

## STANDARD OF REVIEW

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over

the subject matter or for failure to state a cause of action, the allegations of the complaint should

be construed favorably to the pleader."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also

Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164

(1993).  Therefore, the factual allegations must be presumed true, and plaintiffs must be given

every favorable inference that may be drawn from the allegations of fact.  See Scheuer, 416 U.S.

at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  However, the

Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences

that are unsupported by the facts set out in the complaint.  Trudeau v. Fed. Trade Comm'n, 456

F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), plaintiffs have the burden of establishing that the Court has

jurisdiction.  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13

(D.D.C. 2001).  The Court has "an affirmative obligation to ensure that it is acting within the

scope of its jurisdictional authority," id., and "must dismiss a case when it lacks subject matter

jurisdiction," Randolph v. ING Life Ins. & Annuity Co., 486 F. Supp. 2d 1, 4 (D.D.C. 2007).

Hence, plaintiffs' factual allegations in the complaint "'will bear closer scrutiny in resolving a

12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge,

185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 1350 (2d ed. 1987)).  Additionally, a court may consider material other than the

allegations of the complaint in determining whether it has jurisdiction to hear the case, as long as

it still accepts the factual allegations in the complaint as true.  See Jerome Stevens Pharm., Inc. v.

FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117

F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C.

Cir. 1992).

    To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "'a short and

plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed

factual allegations" are not necessary, to provide the "grounds" of "entitle[ment] to relief,"

plaintiffs must furnish "more than labels and conclusions" or "a formulaic recitation of the

elements of a cause of action."  Twombly, 550 U.S. at 555-56 (internal quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937,

1949 (2009) (quoting Twombly, 550 U.S. at 570); accord Atherton v. D.C. Office of the Mayor,

567 F.3d 672, 681 (D.C. Cir. 2009).

## DISCUSSION

    All of plaintiffs' claims, regardless of how characterized, challenge the same agency

conduct: EPA's failure to identify "the waters in which [products listed on the NCP Product

Schedule] may be used," and "the quantities of such [products] which can be used safely in such

waters."  See 33 U.S.C. § 1321(d)(2)(G)(ii)-(iii).  EPA attacks each category of plaintiffs' claims

and argues that they all must be dismissed under either Rule 12(b)(1) or Rule 12(b)(6).  API

argues that all of plaintiffs' claims must be dismissed under Rule 12(b)(1) because they are barred

by the statute of limitations set by 28 U.S.C. § 2401(a).[4]  Because § 2401(a) is jurisdictional in

this circuit, the Court will begin by addressing the timeliness of plaintiffs' action.

Section 2401(a) states: "[E]very civil action commenced against the United States shall

be barred unless the complaint is filed within six years after the right of action first accrues."  28

U.S.C. § 2401(a).  The D.C. Circuit has held, and recently affirmed, that a court "lacks subject

matter jurisdiction to hear a claim barred by section 2401(a)."  See Muwekma Ohlone Tribe v.

Salazar, 708 F.3d 209, 218 (D.C. Cir. 2013) (citing Spannaus v. U.S. Dep't of Justice, 824 F.2d

52, 55 (D.C. Cir. 1987)); see also P & V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021,

1026 (D.C. Cir. 2008) ("The court has long held that section 2401(a) creates a jurisdictional

condition attached to the government's waiver of sovereign immunity." (internal quotation marks

omitted)).

API argues that § 2401(a) applies to both plaintiffs' CWA claims (First and Second

Causes of Action) and plaintiffs' APA claims (Third through Sixty-Fifth Causes of Action).

Lawsuits seeking review of agency action, as plaintiffs' suit does here, are "civil action[s]" within

the meaning of § 2401(a).  See Harris v. FAA, 353 F.3d 1006, 1009-10 (D.C. Cir. 2004)

(applying § 2401(a) in suit challenging final agency action under APA); Conservation Force v.

Salazar, 811 F. Supp. 2d 18, 27 (D.D.C. 2011) (applying § 2401(a) in citizen suit alleging failure

to perform nondiscretionary duty under Endangered Species Act); see also Felter v. Kempthorne,

---

[4] API also asserts that plaintiffs' First and Second Causes of Action do not state a claim
upon which relief can be granted.  But in support of this assertion, API merely incorporates
EPA's arguments by reference and does not offer any arguments of its own.  See API's Mot. to
Dismiss [ECF 23-1] ("API MTD") 3-4.

473 F.3d 1255, 1259 (D.C. Cir. 2007) (stating that § 2401(a) "generally applies to all civil actions whether legal, equitable, or mixed" (internal quotation marks omitted)).  Hence, § 2401(a) applies in this case.

The limitations period set by § 2401(a) begins to run when "the right of action first accrues."  28 U.S.C. § 2401(a).  "A cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court."  Spannaus, 824 F.2d at 56; see also Felter, 473 F.3d at 1259 ("Actions usually accrue when they come into existence." (alterations and internal quotation marks omitted)).  An agency action is final – and suit may be brought – if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  See Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); accord Harris, 353 F.3d at 1010.

In plaintiffs' own words, their suit against EPA is a "challenge to the NCP Product Schedule."  See Pls.' Opp'n to EPA MTD 3.  API contends that this lawsuit comes too late because plaintiffs filed it nearly 30 years after EPA first promulgated a rule setting forth its decision not to specify the waters and quantities in which listed products may be used.  API MTD 7.  Indeed, in the 1984 revisions to the NCP, EPA explained (as it had in the 1983 proposed rule) that the NCP Product Schedule would "not identify the waters or quantities in which listed dispersants and chemicals may safely be used," and stated that, instead, "the waters and quantities in which a dispersant or chemical agent may safely be used are to be determined in each case by the OSC on the basis of all relevant circumstances."  49 Fed. Reg. at 29,193; accord 48 Fed. Reg.

10

at 56,484.  In other words, EPA announced in 1984 its decision not to specify the waters or

quantities in which listed products could be used, so as to give OSCs flexibility to determine on a

case-by-case basis "whether and in what quantities a dispersant may safely be used to control a

particular discharge."  See 49 Fed. Reg. at 29,193 ("The wide variability in waters, weather

conditions, organisms living in the waters, and types of oil that might be discharged requires a

flexible approach.").

       EPA's choice not to limit the use of listed products to pre-specified waters and quantities

marked the "consummation" of the agency's decision process (for the reasons stated in the 1984

rule and 1983 proposed rule); and it was one from which legal consequences flowed – had EPA

chosen to specify waters and quantities on the NCP Product Schedule, the product schedule

would look different than it does today, and decisionmakers' flexibility in responding to future oil

spills would have been curtailed.  See Harris, 353 F.3d at 285.  Hence, EPA's 1984 decision was

a final agency action and subject to suit at that time.

       Plaintiffs do not dispute that EPA took judicially reviewable final agency action in 1984.

Rather, they have styled their claims in an attempt to avoid challenging EPA's decades-old, stated

decision not to include waters and quantities on the NCP Product Schedule.  Their claims can be

grouped into two categories: (1) claims that EPA's actions in publishing the NCP Product

Schedule are arbitrary and capricious; and (2) claims based on EPA's failure to act, brought

pursuant to the citizen suit provision of the CWA and the unreasonable delay provision of the

APA.  Under either formulation, however, the Court concludes that the time for bringing suit has

long since passed and hence plaintiffs' claims must be dismissed.

       Challenges to the NCP Product Schedule

       A large subset of plaintiffs' claims – the Fifth through Sixty-Fifth Causes of Action –

challenge actions taken by EPA in relation to the NCP Product Schedule.  In their Fifth and Sixth

Causes of Action, plaintiffs allege that EPA's "failure to identify in the NCP Product Schedule"

the waters and quantities in which listed products may be used is arbitrary and capricious under

the APA.  Compl. ¶¶ 132, 134.  By contesting EPA's general "failure to identify" waters and

quantities on the NCP Product Schedule, plaintiffs presumably are attacking EPA's decision to

publish the NCP Product Schedule without identifying waters and quantities.  As discussed

above, however, EPA made this decision, pursuant to notice-and-comment rulemaking, in 1984.

See 49 Fed. Reg. at 29,193.  EPA implicitly made this same decision, at the latest, in 1994, when

it last revised the NCP and the Subpart J regulations.  See Pls.' Opp'n to EPA MTD 4

(recognizing that "the Subpart J regulations establish the criteria for listing dispersants on the

NCP Product Schedule").  Because no further decisionmaking as to the content of the NCP

Product Schedule has taken place since that time, plaintiffs' challenges to the schedule's content

appear to be barred by § 2401(a).

Seeking to avoid this result, plaintiffs argue that each time EPA publishes the NCP

Product Schedule or lists a new product, it is taking final agency action that is subject to judicial

review.  To this end, plaintiffs' Seventh through Sixty-Fifth Causes of Action challenge each

listing or relisting of a product on the NCP Product Schedule that has taken place in the last six

years.  Compl. 38-40.  Plaintiffs assert that EPA's publication of the product schedule and listing

of individual products "clearly mark the consummation of EPA's decision-making process" about

which products are eligible for use on an oil discharge.  Pls.' Opp'n to EPA MTD 15.  EPA

responds that its actions in publishing the NCP Product Schedule and listing individual

dispersants represent merely the application of the requirements and procedures established in

Subpart J, which itself represents the consummation of the agency's decisionmaking process.  See

EPA Reply in Supp. of Mot. to Dismiss [ECF 27] ("EPA Reply") 7.  Hence, EPA argues that while plaintiffs might be able to challenge the listing of a particular product as a misapplication of Subpart J, they cannot at this late date challenge the substance of Subpart J.  API similarly argues that it was EPA's announcement of its policy decision concerning NCP Product Schedule listings, rather than that policy's subsequent application, that triggered the statute of limitations. API MTD 7-9.

Notwithstanding plaintiffs' insistence that they are not challenging the Subpart J regulations, the Court concludes that EPA and API have the stronger arguments.  The decision being challenged here is EPA's deliberate decision, as spelled out in the 1984 rule, not to pre-specify waters and quantities for use for each product listed on the NCP Product Schedule. Nothing about that decision has changed in the nearly thirty years since it was made.

API correctly likens this case to Harris v. FAA.  See API MTD 9.  That case involved a challenge by air traffic controllers to the FAA's decision to hire them at the GS-9 grade level. Harris, 353 F.3d at 1008.  The plaintiff controllers had been hired between 1995 and 1998 pursuant to a 1993 Recruitment Notice, which provided an avenue for the controllers to apply for work and stated that they would be hired at the GS-9 grade level.  Id.  The D.C. Circuit held that the plaintiffs' claims were properly dismissed as time-barred under § 2401(a), because the six-year statute of limitations began to run when the FAA published the Notice, not when the plaintiffs were hired.  Id. at 1010-11.  As the court explained: the Notice "constitute[d] an unequivocal statement of the agency's position"; the evidence did "not indicate that the FAA in any way altered or reconsidered its decision regarding the grade and salary of those . . . controllers hired"; and "[t]he hiring of the [plaintiffs] from 1995 to 1998 at the GS-9 level simply implemented the FAA's decision which was made in 1993 and spelled out in the

Notice."  Id. (internal quotation marks omitted).

Similarly here, EPA's periodic publication of the NCP Product Schedule and listing of particular products do not restart the limitations period for challenging the agency's decision not to identify the waters and quantities in which listed products may be used.  EPA's actions in the past six years have "simply implemented" the decision made and spelled out long ago regarding the pre-specification of waters and quantities; that EPA continues to publish the schedule and list products but not pre-specify waters and quantities only shows the agency's continued adherence to its earlier decision.  See id. at 1011.[5]  Therefore, EPA's listing and relisting of particular products on the NCP Product Schedule does not make plaintiffs' action timely.  Their Fifth through Sixty-Fifth Causes of Action are hence time-barred.[6]

---

[5] Given that "[t]he listing of a product on the NCP Product Schedule does not constitute approval of the product," 40 C.F.R. § 300.920(e), it is not clear that listing a product is the final agency action plaintiffs make it out to be.  See Pls.' Opp'n to EPA MTD 13-17 (calling published schedule "the agency's last word" on eligibility of dispersants for use in an oil spill response). The listing of a product does have legal consequences, but plaintiffs likely overstate the significance of listing in relation to EPA's decisionmaking process.  A product's listing "means only that data have been submitted to EPA as required by subpart J"; additional layers of approval are required before a product may actually be used on an oil discharge.  See 40 C.F.R. §§ 300.910, 300.920.  In any case, plaintiffs are not challenging any decision by EPA to list or not list a particular substance; they are challenging EPA's policy, in place for decades now, of listing products and not the waters or quantities in which those products may be used.

[6] Plaintiffs argue that even if they were challenging Subpart J (which they disavow), they could do so "as an as-applied challenge to the regulations."  Pls.' Opp'n to API's Mot. to Dismiss [ECF 28] ("Pls.' Opp'n to API MTD") 11-13; see, e.g., Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys., 195 F.3d 28, 34 (D.C. Cir. 1999) ("[A] party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule, even where the petitioner had notice and opportunity to bring a direct challenge within statutory time limits." (emphasis added)).  This argument is without merit.  That plaintiffs have standing to bring this suit, as they may be impacted by the use of dispersants under the NCP, does not give them standing to bring an as-applied challenge.  The Subpart J regulations have not been applied or enforced "against" plaintiffs.  The regulations do not impose any obligations on plaintiffs, or set criteria governing the listing of products that plaintiffs manufacture, or otherwise regulate plaintiffs' conduct.

EPA's Failure to Act

In addition to their claims directed at EPA's actions in preparing and publishing the NCP

Product Schedule, plaintiffs also raise claims based on EPA's inaction.   In their First and Second

Causes of Action, plaintiffs allege that EPA has failed to perform nondiscretionary duties under

the CWA.   See 33 U.S.C. § 1365(a)(2) (authorizing citizen suits under CWA for failure of EPA

Administrator to perform nondiscretionary act or duty); see also id. § 1321(d)(2)(G)(ii)-(iii).   In

their Third and Fourth Causes of Action, plaintiffs bring unreasonable delay claims under the

APA.   See 5 U.S.C. § 706(2).   EPA contends that plaintiffs' "inaction" claims should be

dismissed under Rule 12(b)(6) for failure to state a claim.   API argues that even if the inaction

claims state a claim for relief, they are time-barred.   Addressing these arguments below, the

Court agrees with API.

Regarding plaintiffs' CWA claims, EPA asserts that section 311(d)(2)(G) of the CWA

does not impose a nondiscretionary duty because that provision does not set a "bright-line, date-

specific deadline[] for specified action."   See EPA's Mot. to Dismiss [ECF 16-1] ("EPA MTD")

10 (internal quotation marks omitted).   A date-certain deadline is necessary to find a

nondiscretionary duty, but, as plaintiffs correctly point out, a deadline expressly set forth by

statute is not.   See Sierra Club v. Jackson, 724 F. Supp. 2d 33, 39 n.2 (D.D.C. 2010) (citing

Sierra Club v. Thomas, 828 F.2d 783, 791 n.58 (D.C. Cir. 1987) ("[A date-certain] deadline may

exist, even though not explicitly set forth in the statute, if it is readily-ascertainable by reference

to a fixed date or event.")); see also Conservation Force v. Salazar, 753 F. Supp. 2d 29, 34-35

---

Indeed, plaintiffs point to no application of the Subpart J regulations that they find objectionable,
and absent application of the regulations against plaintiffs, they may not pursue out-of-time
objections to the regulations under the guise of an as-applied challenge.

(D.D.C. 2010), aff'd, 699 F.3d 538 (D.C. Cir. 2012).  The Act states that the President "shall"

prepare and publish a NCP that "shall" include a schedule identifying not only dispersants that

may be used in carrying out the NCP but also the waters and quantities in which those

dispersants may be used.  33 U.S.C. § 1321(d)(1), (2)(G).  The use of the word "shall" indicates

the existence of a duty that is nondiscretionary, see Coal. for Responsible Regulation, Inc. v.

EPA, 684 F.3d 102, 126 (D.C. Cir. 2012), and the lack of an explicit statutory deadline does not

preclude a nondiscretionary duty of timeliness, see Sierra Club, 828 F.2d at 790-91.  Hence,

plaintiffs' claims may be authorized by the CWA's citizen suit provision.

        The Court need not decide whether plaintiffs' claims are authorized, however, because

they would be time-barred in any event.  If it is assumed that section 311(d) imposes a

nondiscretionary duty to specify waters and quantities by a date-certain deadline, then that

deadline must have been triggered by "a fixed date or event."  See id. at 791 n.58.  Because, in

plaintiffs' view, EPA's act of putting in place the NCP Product Schedule carried with it a

concomitant duty to specify the waters and quantities in which listed products could be used, the

triggering event, if any, must have been EPA's "mak[ing] provisions for" the NCP Product

Schedule by regulation.  See 40 C.F.R. § 300.900(a) ("Section 311(d)(2)(G) of the CWA requires

that EPA prepare a schedule of dispersants, other chemicals, and other spill mitigating devices

and substances, if any, that may be used in carrying out the NCP.  This subpart makes provisions

for such a schedule."); 40 C.F.R. § 300.81(a) (1985) ("This subpart [former Subpart H] makes

provisions for such a schedule.").  Compare, e.g., Bennett, 520 U.S. at 172 (finding that by

making critical habitat determination, agency had nondiscretionary duty to take into account

economic and other impacts); Coal. for Responsible Regulation, 684 F.3d at 126 ("Having made

the Endangerment Finding . . . EPA lacked discretion to defer promulgation of the Tailpipe

Rule . . . .").  Plaintiffs' CWA claims, then, would have ripened in 1984 (or, at the latest, in 1994), when "it was evident that EPA had not performed a nondiscretionary duty."  See W. Va. Highlands Conservancy v. Johnson, 540 F. Supp. 2d 125, 137-39 (D.D.C. 2008) (concluding that plaintiffs' challenge to "what the agency ha[d] failed to do for over twenty years in direct contravention of Congress' plain directive" was barred by § 2401(a)).  Because far more than six years have elapsed between the accrual of plaintiffs' claims and this suit, their First and Second Causes of Action will be dismissed.  See id.

As to plaintiffs' unreasonable delay claims, EPA argues that plaintiffs are "actually challenging the legal adequacy of Subpart J of the NCP" and have asserted unreasonable delay claims "simply to circumvent statutory time limits on judicial review of Subpart J."  See EPA MTD 11-12.  Plaintiffs counter that their unreasonable delay claims are properly asserted challenges to EPA's failure to identify statutorily required information in the NCP Product Schedule.  See Pls.' Opp'n to EPA MTD 19-21.

This dispute is similar to the one faced by this Court in West Virginia Highlands Conservancy v. Johnson.  In that case, which involved alleged agency failures to perform nondiscretionary duties related to the regulation of coal mining wastes, the parties disagreed as to the proper characterization of the agency defendants' regulatory activities.  540 F. Supp. 2d at 129, 134.  The plaintiffs sought to challenge "what the agency ha[d] not done," whereas the defendants claimed that the plaintiffs were trying to challenge "final agency decisions made over two decades ago."  Id. at 134.  This Court found that both sides had some merit, but did not have to resolve the dispute because, regardless of whether agency action or agency inaction formed the basis of the plaintiffs' claims, they were untimely.  See id. at 134, 144.  The same is true here.  As discussed above, plaintiffs' claims challenging EPA's actions in creating the NCP Product

Schedule are untimely.  And even assuming that plaintiffs' unreasonable delay claims are properly characterized challenges to agency inaction, they are nonetheless subject to § 2401(a) and, like plaintiffs' CWA claims, have been brought too long after plaintiffs' right of action "first accrue[d]."  See 28 U.S.C. § 2401(a).  Unreasonable delay claims could have been brought in 1984, once EPA announced its policy that waters and quantities would not be specified on the NCP Product Schedule and that, instead, "the waters and quantities in which a dispersant or chemical agent may safely be used [would] be determined" on a case-by-case basis.  See 49 Fed. Reg. at 29,193.  Possibly, such claims accrued anew after the Subpart J regulations were finalized in 1994.  But in any event, as in West Virginia Highlands Conservancy, "the specific accrual date makes no difference in this case because under any formulation," it appears "beyond dispute that the six-year limitations period expired well before plaintiffs instituted the present action."  See 540 F. Supp. 2d at 139.  Accordingly, plaintiffs' Third and Fourth Causes of Action will be dismissed.

Before concluding, a word about the continuing violation doctrine is appropriate.  That doctrine was invoked by the plaintiffs in West Virginia Highlands Conservancy, who did not seriously dispute that more than six years had elapsed since their claims first accrued but argued instead that the "agency's persistent nonfeasance in the face of a statutory deadline constitute[d] a continuing violation of federal law."  See id.  As the plaintiffs pointed out, the D.C. Circuit had suggested in dictum that an agency's continuing violations of its statutory obligations could toll the limitations period set by § 2401(a).  See id. (discussing Wilderness Society v. Norton, 434 F.3d 584, 588-89 (D.C. Cir. 2006)).  But this Court declined to follow that dictum from Wilderness Society, which was silent on whether § 2401(a) is jurisdictional, because more recent Supreme Court and D.C. Circuit authority compelled the conclusion that § 2401(a) is

jurisdictional and hence could not be tolled by the continuing violations doctrine.  See id. at 141-43 (discussing John R. Sand & Gravel Co v. United States, 552 U.S. 130 (2008), and P & V Enters., 516 F.3d at 1026-27); see also id. at 141 ("'Traditionally, when a statute of limitations has been deemed jurisdictional, it has acted as an absolute bar and could not be overcome by the application of judicially recognized exceptions such as the continuing violations doctrine.'" (alterations omitted) (quoting Felter v. Norton, 412 F. Supp. 2d 118, 122 (D.D.C. 2006))).

However, in a D.C. Circuit decision post-dating West Virginia Highlands Conservancy, Judge Garland recognized, apparently with approval, that the court in Wilderness Society had indicated that the plaintiff's suit was not time-barred by § 2401(a) because the National Park Service was "in continuous violation" of its obligation to meet a statutory deadline.  AKM LLC v. Secretary of Labor, 675 F.3d 752, 763 n.6 (D.C. Cir. 2012) (Garland, J., concurring in the judgment).  As in Wilderness Society, there was no mention of whether § 2401(a) was jurisdictional, but as observed there, it may be that under particular circumstances an agency's continuing violation might support an otherwise untimely claim.  See id.  However, it remains this Court's view that allowing claims to proceed where, as here, it is clear that the claims "first accrue[d]" outside the six-year limitations period, would be inconsistent with the jurisdictional nature of § 2401(a).[7]  See 28 U.S.C. § 2401(a); P & V Enters., 516 F.3d at 1026; W. Va. Highlands Conservancy, 540 F. Supp. 2d at 143; see also Ctr. for Biological Diversity v.

---

[7] One judge in this district has followed the dictum from Wilderness Society in rejecting the contention by EPA that an action for failure to perform a nondiscretionary duty under the Clean Air Act was time-barred.  See Sierra Club v. EPA, 850 F. Supp. 2d 300, 304 (D.D.C. 2012) (discussing Wilderness Society, 434 F.3d at 588-89, and concluding that "dismissing this action as untimely likely would be error").  But the court in Sierra Club did not reconcile the dictum in Wilderness Society with D.C. Circuit precedent holding that § 2401(a) is jurisdictional; because of that precedent, this Court finds that dismissing this action is appropriate.

Hamilton, 453 F.3d 1331, 1335-36 (11th Cir. 2006) ("Because section 2401 unambiguously imposes a six-year statute of limitations, our refusal to extend the application of the continuing [violation] doctrine comports with principles of sovereign immunity.").

Moreover, plaintiffs do not purport to rely on the continuing violation doctrine, see Pls.' Opp'n to EPA MTD 22 n.17, and this Court will not rely on a theory not advanced by a party to overcome a jurisdictional statute of limitations.[8]  Plaintiffs appear to believe that resort to the continuing violation doctrine is not necessary because "each time EPA publishes the NCP Product Schedule without the requisite waters and quantities information," the agency "fails to comply with the Clean Water Act."  See id.  Yet, with respect to plaintiffs' claims challenging agency action, the Court has already rejected the argument that each publication of the NCP Product Schedule restarts the limitations period.  When EPA publishes the schedule, it is merely implementing its decades-old decision not to identify waters and quantities for use on the schedule and instead make those determinations on a case-by-case basis.  Plaintiffs' claims challenging agency inaction are not advanced by the periodic publication of the NCP Product Schedule either, because they are not based on any new or continued action by EPA; rather, they are based solely on the agency's persistent inaction, about which nothing has changed since the claims first accrued.  Cf. AKM, 675 F.3d at 758 ("While we held [in Int'l Union, United Auto.,

---

[8] Plaintiffs' choice not to make a continuing violations argument is perhaps an implicit recognition that such an argument would not be viable in these circumstances.  Notably, plaintiffs do not contest that § 2401(a) is jurisdictional.  See, e.g., Pls.' Opp'n to API MTD 11 n.10 (recognizing holding in West Virginia Highlands Conservancy).  Nor do they contend that EPA's failure to act only became evident during the six-year period preceding their complaint.  See AKM, 675 F.3d at 757 ("[C]ontinuing violations are those whose character as a violation did not become clear until they were repeated during the limitations period, typically because it is only the cumulative impact that reveals their illegality." (alterations and internal quotation marks omitted)).

<u>Aerospace & Agric. Implement Workers v. NLRB</u>, 363 F.2d 702, 706-07 (D.C. Cir. 1966)] that

continued actions may extend the statute of limitations, nothing in that case suggests that <u>inaction</u>

has the same effect, and this case is about inactions . . . .").  In short, plaintiffs have not alleged

facts that would make any of their claims timely, and the continuing violation doctrine cannot

accomplish that for them here.  Hence, their claims will be dismissed for lack of subject matter

jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court will grant the motions of EPA and API to dismiss.

A separate order accompanies this memorandum opinion.


_____/s/_____
JOHN D. BATES
United States District Judge


Dated: <u>May 7, 2013</u>